**UNITED STATES, Appellee,**

v.

**Mark BRUCK, Defendant, Appellant.**

No. 96–1952.

United States Court of Appeals,
First Circuit.

Heard Feb. 3, 1998.

Decided Sept. 1, 1998.

---

8. This instruction was later repeated.

Thomas G. Murray for appellant.

Ariane D. Vuono, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.

Before TORRUELLA, Chief Judge, SELYA and STAHL, Circuit Judges.

STAHL, Circuit Judge.

Following an eight-day trial, a jury convicted defendant-appellant Mark Bruck of conspiracy to commit bank fraud, *see* 18 U.S.C. § 371 (Count I); bank fraud, *see* 18 U.S.C. § 1344 (Count II); conspiracy to commit wire fraud, *see* 18 U.S.C. § 371 (Count III); wire fraud, *see* 18 U.S.C. § 1343 (Counts IV and V); arson, *see* 18 U.S.C. § 844(i) (Count VI); and the use of fire to commit a felony, *see* 18 U.S.C. § 844(h)(1) (Count VII). Thereafter, the district court sentenced Bruck to concurrent 78–month terms of incarceration on Counts I–VI, and a consecutive 60–month term on Count VII. Bruck seeks a new trial, arguing that the district court erred in (1) declining to sever Counts I and II from the remaining charges in the indictment; (2) declining to hold a hearing on his competence to stand trial and to grant him an eve-of-trial continuance to gather evidence relating to his allegedly impaired mental condition; and (3) permitting the government's case agent to give certain opinion testimony. We affirm.

### I.

In disregard of Fed. R.App. P. 28(a)(4) and (e), Bruck's brief contains neither a summary of the evidence presented at trial nor pertinent record citations. We therefore largely adopt the government's factual presentation, adding explanatory details wherever we believe it helpful and deferring the details of the procedural history relevant to the issues Bruck advances on appeal to our discussions of those issues.

Bruck was the President and principal stockholder of Advance Resins, Inc. Advance Resins, which was in the business of grinding, recycling, and coloring plastic, occupied three converted airplane hangars in Chicopee, Massachusetts. The company used two buildings it owned—Buildings One and Two (we use the company's denominations)—for operations and office space, and a leased building—Building Three—for storage. Advance Resins had once been a promising business, but by 1990, it had fallen on hard economic times.

In January 1980, Advance Resins reached an agreement for a revolving line of credit with Third National Bank. Throughout the 1980s and into the 1990s, this agreement remained in effect with Third National's two successor banks—Bank of New England and Fleet Bank. For the sake of simplicity, we refer to the three banks collectively as "the Bank." According to the agreement, Advance Resins had a borrowing capacity of up to $1.7 million, depending upon the daily value of its inventory and accounts receivable. Each morning, Advance Resins reported the value of its accounts receivable to the Bank. By factoring in the value of the company's inventory (which Advanced Resins reported monthly), the Bank used this daily report to determine the amount of credit to which the company would be entitled for the day.

In the mid–1980s, Advance Resins began to experience cash flow problems. This led Bruck to direct his employees to report false inventory and sales figures to the Bank. By doing so, Advance Resins fraudulently increased the amount of credit available to it to meet the company's daily cash flow needs. In late 1992, the Bank terminated the line of credit after discovering Advance Resins' inaccurate reporting during a field examination of the account. Thereafter, Advance Resins repaid in full all outstanding loans from the Bank.

Advance Resins' financial woes continued to mount. In late February 1994, Bruck decided to expand the company's insurance coverage (which had previously extended only to Buildings One and Two) by purchasing from MassWest Insurance Company $1 million of coverage for Building Three's physical plant and $900,000 of coverage for its contents. Bruck explained to his insurance agent that the company planned to purchase and improve Building Three in order to make it suitable for operations. Immediately after arranging for the additional insurance coverage, Bruck ordered his employees to move equipment and highly flammable products into Building Three.

On Saturday, March 5, 1994, less than a week after changing Advance Resins' insurance coverage, Bruck hired several welders to do some minor work inside Building

Three. Bruck met the welders and stayed with them as they completed their work. The welders left the building shortly after nightfall, but Bruck stayed behind for a short time, ostensibly to lock up. Just before midnight, a passerby reported to the Chicopee Fire Department that Building Three was on fire. The fire destroyed the building and its contents.

The federal Bureau of Alcohol, Tobacco, and Firearms ("ATF")`investigated the conflagration and determined, based upon various fire investigation techniques, that the fire had numerous points of origin in the warehouse area where Bruck had been alone for some period after the welders departed the premises. Significantly, there was no evidence that the fire had a point of origin in the area of Building Three where the welders had been working. The overall evidence led ATF to conclude that the fire had been deliberately set.

In interviews conducted shortly after the fire, Bruck made a number of misleading statements to ATF agents. He indicated that Advance Resins was immensely successful, falsely stating that the company had recently gone to a 24–hour production schedule to keep up with orders. He also claimed to be certain that the welders had caused the fire, despite having noticed nothing unusual while locking up after the welders had finished their work. Finally, he told the agents that the replacement cost of the destroyed equipment and inventory was approximately $1.5 million. This proved to be a gross exaggeration.

Investigators soon learned that, before the fire, Bruck had ordered his bookkeeper and other employees to grossly inflate the value of the inventory stored in Building Three. After the fire, Bruck discovered that his employees had not finished fabricating and recording the inflated figures. He then ordered them to complete the task immediately so that he could present the fictitious figures to the insurance adjuster. Eventually, Bruck delivered to the adjuster false inventory figures indicating that approximately $1.3 million in inventory had been lost in the fire. Not long thereafter, on February 7, 1995, a federal grand jury returned a seven-count indictment charging Bruck with the crimes for which he stands convicted.

## II.

### A. Misjoinder and Severance

■ Prior to trial, Bruck filed a motion to sever the counts pertaining to his bank fraud (Counts I and II) from the counts pertaining to the insurance fraud and arson (Counts III–VII), contending that these two groups of counts were not properly joined under Fed.R.Crim.P. 8(a) ("Two or more offenses may be charged in the same indictment ... if the offenses charged ... are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."). Magistrate Judge Neiman agreed, holding that the bank fraud charges and insurance fraud and arson-related charges were substantially dissimilar and temporally distinct. He accordingly ordered that Counts I and II be severed from the remaining counts and tried separately.

The district court, however, summarily reversed the magistrate judge's determination as contrary to law. See 28 U.S.C. § 636(b)(1)(A) (non-dispositive pretrial order of a magistrate judge may be "reconsider[ed] ... where it has been shown that the ... order is clearly erroneous or contrary to law"). The court therefore ordered that all charges be tried together. Bruck claims that the district court's ruling was prejudicial error.

Insofar as Bruck claims error, his argument is not without some force. Although the Tenth Circuit has taken the position that three separate and apparently temporally distinct bank and insurance fraud schemes were properly joined under Fed.R.Crim.P. 8(a) because each involved an "alleged[ ] defraud[ing] of the victim through the submission of falsified documents," *United States v. Hollis,* 971 F.2d 1441, 1456 (10th Cir.1992), we cannot say that the factors we have cited repeatedly as most relevant to whether two or more charges are properly joined strongly favored joinder in this case. See *United States v. Edgar,* 82 F.3d 499, 503 (1st Cir.)

(directing courts to look to "'whether the charges are laid under the same statute, whether they involve similar victims, locations, or modes of operation, and the time frame in which the charged conduct occurred'") (quoting *United States v. Taylor*, 54 F.3d 967, 973 (1st Cir.1995)), *cert. denied*, 117 S.Ct. 184, 136 L.Ed.2d 123 (1996). Furthermore, we note that arson, with the attendant physical dangers it presents to, at the very least, the firefighters summoned to extinguish the blaze, is an offense of dissimilar character to bank fraud. Indeed, we note that the sentencing guidelines set the base offense level for arson involving a structure other than a dwelling, without any adjustments for specific offense characteristics, at 20, *see* U.S.S.G. § 2K1.4(a)(2), but set the base offense level for bank fraud, *sans* specific offense adjustments, at 6, *see* U.S.S.G. § 2F1.1.

■ We do, however, part company with Bruck insofar as he views any misjoinder as prejudicial. *See United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) ("[A]n error involving misjoinder affects substantial rights and requires reversal only if the misjoinder results in actual prejudice."); *see also* Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). We reach our conclusion by assuming *arguendo* that a misjoinder exists but answering in the negative the harmless-error inquiry appropriate for non-constitutional error: was the putative error likely to have "'had substantial and injurious effect or influence in determining the jury's verdict?'" *Lane*, 474 U.S. at 449, 106 S.Ct. 725 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

■ Obviously, the rule against misjoinder primarily seeks to serve the same interest advanced by the general rule set forth in Fed.R.Evid. 404(b)("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."). That is, the rule against misjoinder strives to ensure that the jury does not convict an accused of a charged crime simply because the accused has been charged with, or convicted of, a different, unrelated crime. *Cf. United States v. Amato*, 15 F.3d 230, 236–37 (2d Cir.1994) (recognizing that the joinder of dissimilar charges creates excessive risk of prejudicial spillover). We therefore analyze whether the insurance fraud and arson-related evidence was likely to have caused the jury to convict on the bank fraud charges, and/or whether the bank fraud evidence was likely to have caused the jury to convict on the insurance fraud and arson-related charges. On both issues, we think it unlikely that the jury was led astray.

With respect to the bank fraud charges, several factors drive our conclusion. We believe it likely that, at a separate bank fraud trial, much of the insurance fraud and arson-related evidence would have been relevant to whether Bruck had the requisite unlawful intent with respect to the bank fraud. *See* Fed.R.Evid. 404(b) (evidence of similar other acts can be relevant to issues pertaining to an accused's intent); *cf. Lane*, 474 U.S. at 450, 106 S.Ct. 725 (finding misjoinder harmless because evidence with respect to the charge that should have been severed would likely have been admissible at a separate trial). After all, Bruck's *modus operandi*—inflating inventory and sales figures with the intent to secure advantage from large financial institutions—was nearly identical in each episode. Moreover, Bruck's testimony tended to put in question both whether he had the capacity to form the requisite intent and whether Bruck was merely present where others were committing the crime. *See generally* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, §§ 404.22[1][b] and [c](Joseph M. McLaughlin, ed., Matthew Bender 2d ed.1998) (Fed. R.Evid.404(b) other act evidence tends to be relevant when sufficiently similar to charged offense and when the defense puts intent in question by challenging defendant's capacity and/or by suggesting that defendant was merely present at a crime scene). The fact that the insurance fraud and arson came some time after the bank fraud does not detract from the likely relevance of the insurance fraud and arson-related evidence in this instance. *See id.* at §404.22[1][a] (noting

that subsequent acts can be relevant to prove intent).

Of course, the trial court might have excluded this evidence as cumulative because the evidence of Bruck's intent with respect to the bank fraud, standing alone, was very strong. *See* Fed.R.Evid. 403. Bruck's accountant and one of his sales agents testified that Bruck had ordered them to falsify the books every day for many years; their testimony was entirely consistent with each other, with that of several Bank employees, and with reports from customers; and the false accounting books were themselves before the jury as evidence. Yet the overwhelming nature of this evidence *itself* compels the conclusion that the insurance fraud and arson-related evidence did not cause the jury to convict Bruck of bank fraud. *See Lane*, 474 U.S. at 450, 106 S.Ct. at 732 (overwhelming evidence of guilt on a particular charge typically renders misjoinder of another charge non-prejudicial).

With respect to whether the bank fraud evidence likely led the jury to convict Bruck on the insurance fraud and arson-related charges, our analysis is similar. For the same reason that much of the insurance fraud and arson-related evidence would likely have been relevant at a bank fraud trial to show Bruck's intent with respect to the bank fraud, much of the bank fraud evidence would likely have been relevant at a trial on the insurance fraud and arson-related charges to show Bruck's intent with respect to those charges. Moreover, although the evidence against Bruck on these charges was largely circumstantial, it was quite strong: the fire came less than a week after Bruck changed the insurance to cover a building Advance Resins did not yet own; Bruck moved equipment and flammable material into Building Three immediately before the fire; Bruck was the last person in the building before the fire started; and Bruck sought to inflate the inventory figures in Building Three before and after the fire. Finally, the bank fraud evidence would only have tended to reinforce a theme that already would have been before the jury on the basis of the insurance fraud and arson-related evidence: that Bruck defrauded large financial institutions in order to gain funds for Advance Resins. Thus, although the bank fraud evidence also might have been excludable as cumulative under Fed.R.Evid. 403, we are confident that it was not the difference-maker that led the jury to conclude that Bruck set the fire in Building Three and then sought to defraud Advance Resins' insurer.

For these reasons, we conclude that any misjoinder of the bank fraud charges and the arson-related charges was not prejudicial.

### B. Competency and the Motion to Continue

Bruck has a history of psychological illness, and as the December 4, 1995 trial date approached (after several continuances to accommodate defense counsel's schedule), Bruck began to behave in a particularly erratic manner. Contrary to his lawyer's specific instructions not to have contact with any witnesses, Bruck wrote a letter to a government witness urging her to change her anticipated testimony. Also, defense counsel reported that he was experiencing ever-increasing difficulty in communicating with Bruck, and that Bruck was showing signs of significant disorientation and forgetfulness. Finally, counsel reported that the Social Security Administration was sending Bruck's benefit checks to Bruck's mother because it had concerns about Bruck's competence to handle his own affairs.

On November 8, 1995, defense counsel brought these matters to the district court's attention in a motion for a competency hearing. In support of his motion, counsel argued that Bruck was potentially incapable of understanding the proceedings against him and/or assisting with his defense. *See Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (setting forth the test for competence to stand trial). On November 13, 1995, the court ordered that Bruck undergo an examination to determine his competence to stand trial, but asked that the examination and report be expedited to the extent practicable, given the proximity of the trial date and the inconvenience yet another continuance would cause a number of out-of-state government witnesses. Over the next several days, Howard Lester, Ed.D., examined Bruck and concluded that, while he

would have liked to have conducted more extensive testing and perused medical records he was unable to obtain on the tight deadlines established by the court, Bruck was competent to stand trial. Lester also concluded that Bruck probably was fabricating or exaggerating many of his symptoms.

On the basis of Lester's report (which was not filed until December 1, 1995, but whose basic conclusions were reported to the judge and counsel during the last week in November), the court denied defense counsel's request for a full-blown evidentiary hearing. So too did the court deny several motions by the defense for a continuance—filed between November 21, 1995 and December 4, 1995—to develop psychological evidence tending to establish that Bruck was insane and/or lacked the *mens rea* to commit the crimes with which he was charged. Bruck now claims that the district court's failure to afford a competency hearing and/or to grant a continuance was error. We do not agree.

■ Because the conviction of a criminal defendant while he is legally incompetent violates due process, *see Pate v. Robinson,* 383 U.S. 375, 378, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), a district court has a duty to order a competency hearing if there is "reasonable cause" to doubt the defendant's competence to stand trial, *see* 18 U.S.C. § 4241. Yet if a qualified mental health professional has determined that a defendant is competent, "a court is not required to hold a further evidentiary hearing absent extenuating circumstances." *United States v. Lebron,* 76 F.3d 29, 32 (1st Cir.), *cert. denied,* 518 U.S. 1011, 116 S.Ct. 2537, 135 L.Ed.2d 1060 (1996). We review a district court's decision not to hold a full competency hearing only for abuse of discretion so long as there was a sufficient evidentiary basis to ground the court's competency determination. *See id.*

■ We review the denial of a motion for a continuance to develop or locate evidence pertinent to a defendant's psychological condition under a similar paradigm. In conducting our review, we consider (1) defendant's diligence in preparing his defense; (2) the likely utility of the continuance if granted; (3) the inconvenience to the court, witnesses, and the government; and (4) the

extent to which the defendant may have suffered prejudice from the denial. *See United States v. Soldevila–Lopez,* 17 F.3d 480, 488 (1st Cir.1994). Again here, we accord deference to the trial court's decision to deny the motion. *See id.* at 487.

In this instance, Bruck has provided us with no basis for concluding that the lower court abused its discretion with respect to its failure to hold a full-blown competency hearing. In his brief, Bruck simply asserts, without elaboration, that "enough was contained in counsel's motion and recitation to the Court, and indeed in Dr. Lester's report which would warrant a conclusion" that Bruck was incompetent. He also generally states that "[a] reading of the Defendant's testimony during trial supports the conclusion that the Defendant was not functioning within the realm of competence," and points to the fact that the court had Bruck taken into custody following the verdicts because it felt that Bruck was a suicide risk. Such generalizations, unsupported by efforts at applying specific record evidence to the relevant legal standards, leaves us in the position of simply stating that, on our review of the record, we discern no abuse of discretion in the trial court's acceptance of Dr. Lester's conclusion that Bruck was competent to stand trial without taking additional evidence.

■ So too do we leave intact the court's decision not to award Bruck an eve-of-trial continuance to develop further psychological evidence. Bruck has made no effort to point us to evidence suggesting that he had a diminished capacity to form criminal intent and/or that he was legally insane at the time he committed his crimes. All he has done is to emphasize that there is evidence he never obtained—e.g., whatever evidence led the Social Security Administration to send Bruck's benefits checks to Bruck's mother—that *might* have assisted him in generating a last-minute, *mens rea*-related defense. This argument is plainly insufficient for us to find an abuse of discretion on this record, especially given Bruck's failure to discuss the relevant insanity and diminished capacity principles and to apply those principles to the record of

this case. In so ruling, we also note Bruck's apparent lack of diligence in failing to secure the missing evidence in the two and one-half years since his trial, despite the fact that the extent to which the moving party may have been prejudiced by the denial of a motion to continue is one of the factors we look to in assessing whether the lower court acted within its discretion. *See Soldevila–Lopez,* 17 F.3d at 488.

For these reasons, we decline to revisit the question of Bruck's competence and/or to order a new trial because the district court denied Bruck's motions for a continuance.

*C. Opinion Testimony*

█ In his brief, Bruck excerpts the following exchange between the government's trial counsel and Special Agent Michael Bouchard, who was the case agent and lead investigator in the government's arson case against Bruck:

Q. (By AUSA Kinder). Could you have a seat please[?] Based on the training and experience you have had in arson investigations, have you learned that there's certain indicators in an arson for profit scheme that you look for?

MR. MURRAY [Defense counsel]: Objection.

THE COURT: He may testify.

A. Yes.

Q. Did you find any of those indicators for the investigation of the Advance Resins' fire?

A. Yes, I did.

Q. What were they?

A. The fire was deliberately set in multiple locations. The fire was set for economic—

MR. MURRAY: I object and move to strike. That is a conclusion left to the jury's determination, not this agent's.

THE COURT: Well, he may give his opinion based on his experience, background and training, and on the number of fires he's investigated, teaching experience and so forth. Based on that, he may give his opinion as to whether or not it was a set fire and to show how he determined it.

Bruck then makes the following argument, which we reproduce verbatim in its entirety:

Allowing this testimony was clear error. In the first place defense counsel was totally surprised that an expert opinion had been sought from the agent, in that no notice was given under Rule 16(a)(1)E of the Federal Rules of Criminal Procedure. Additionally, the opinion is incompetent under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and inadmissible under Rule 704(b) of the Federal Rules of Evidence as an opinion on the ultimate issue. The trial judge however was obdurate in allowing the testimony to remain. Given the disputed nature of the arson testimony, this error, standing alone, requires reversal.

At oral argument, counsel rested on his brief with respect to this question.

█ Counsel's approach to this issue has left us less than fully certain as to exactly what testimony Bruck finds objectionable. The government followed the lower court's lead and assumed that the testimony being challenged was Agent Bouchard's statement that "[t]he fire was deliberately set in multiple locations." And indeed, in the "Overview" section of his brief, Bruck states that he will be arguing that it was error to allow Bouchard to opine that the fire was deliberately set. The timing of counsel's objection, however, in combination with the non-specific nature of the argument presented, leaves us wondering whether the objected-to testimony was, in fact, Agent Bouchard's opining that the fire was set for economic reasons. Given this state of affairs, we regard the point as having been waived. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990). But in any event, in view of what we regard as strong evidence of guilt on the insurance fraud and arson-related charges, we are confident that any improperly-admitted opinion testimony was absolutely harmless. *See United States v. Newman,* 49 F.3d 1, 7 (1st Cir.1995) (ruling that the erroneous admission of opinion as to the ultimate issue of guilt or innocence was harmless).

We therefore decline to disturb Bruck's convictions on the basis of this colloquy.

48

## III.

For the reasons stated, we *affirm* Bruck's convictions in all respects.