# United States Court of Appeals
## For the First Circuit

No. 07-1880

UNITED STATES OF AMERICA,

Appellee,

v.

FERNANDO GONZALEZ-RAMIREZ, a/k/a Fernando,

Appellant, Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lynch, Chief Judge,

Merritt[*] and Howard, Circuit Judges.

George J. West for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Robert Clark Corrente, United States Attorney and Mary E. Rogers, Assistant United States Attorney, were on brief, for appellee.

March 25, 2009

[*]Of the Sixth Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**. Appellant Fernando Gonzalez-Ramirez ("Gonzalez") was convicted of conspiring to distribute and aiding and abetting the distribution of cocaine. He was sentenced to twenty years in prison. On appeal, Gonzalez claims that the district court erred in denying his pre-trial motion for a competency hearing and in admitting certain evidence. He also asserts that the evidence was legally insufficient to convict him, and that his sentence violated his constitutional rights. Finding no error, we affirm the conviction and sentence.

## I. FACTUAL BACKGROUND

We review the facts in the light most favorable to the jury's verdict. United States v. Marin, 523 F.3d 24 (1st Cir. 2008). In January 2006, law enforcement authorities were investigating two Rhode Island men, Estoredarico Bernard ("Belige"), and Eucraneo Severino ("Severino"). The investigation included surveillance of a liquor store that Belige owned and operated, an import/export business owned and operated by Severino, and Severino's residence.

During this time period, Gonzalez lived in Denver, Colorado, where he served as a middleman for Colorado-based cocaine dealers tied to Mexican drug cartels. His role was to find customers in the northeast United States. Belige was one such customer.

In late January, authorities eavesdropped on a telephone call from Gonzalez to Belige, in which Gonzalez left the message, "Uncle. I am Fernando. Call me back whenever you can to [a phone number]." Two days later, Belige listened to the message three times, and then returned the call, leaving the following message: "Your uncle is calling you. Call me back." Gonzalez returned the call and the two spoke for a short time. The conversation went as follows:

> **Belige**[1] ("B"): Hello.
> **Gonzalez** ("G"): Oh, Hello, uncle, how have you been?
> **B:** Go ahead, go ahead, go ahead.
> **G:** [Chuckles]
> **B:** Where were you? Were you lost?
> **G:** No, there wasn't any. [chuckles].
> **B:** [chuckles]
> **G:** Oh well things were calm.
> **B:** Oh that's good.
> **G:** Yeah.
> **B:** Yeah.
> **G:** So, are you working?
> **B:** Yeah.
> **G:** Yeah?
> **B:** Yeah.
> **G:** Do you want me to take a ride over?
> **B:** Come over today.
> **G:** [Chuckles] It's just that I'm getting it for you way too high.
> **B:** Oh, s--t, then you're not right.
> **G:** Huh?
> **B:** What . . . where are you driving?
> **G:** Come again?
> **B:** What's the mileage? How much are you driving?
> **G:** For 19.

---

[1] The briefs refer to this individual as "Belige." The transcripts of the phone conversations use "Beligue." For the sake of consistency, we use the former spelling.

**B:** What? You are crazy (laughter)(unintelligible) is here this week.

**G:** Yeah?

**B:** Huh?

**G:** And what about 18 ½?

**B:** Huh?

**G:** 18 ½.

**B:** Well - it can be done.

**G:** Yeah?

**B:** To help you out.

**G:** Yeah, well let me - let me see if I can get ready right away and I'll call you in the afternoon.

**B:** What?

**G:** That I'll be ready right away and I'll call you in the afternoon.

**B:** Well come over here before the other one arrives.

**G:** Yeah, yeah.  If I go, I'll be arriving in two days.

**B:** Oh, around Saturday.  Saturday?

**G:** Yeah.

**B:** Okay.

**G:** Alright.

According to Central Falls, R.I., Detective Dorian Rave[2], the above conversation was actually rife with coded language concerning the delivery of cocaine to Belige.  For example, "there wasn't any" was an indication that Gonzalez had been out of contact because of a depleted cocaine supply; when he asked whether Belige was "working," Gonzalez was asking whether Belige was dealing drugs; finally, the discussion of "mileage" -- 18 ½ and 19 -- was actually the price per kilogram in thousands of dollars.

True to his word, Gonzalez called Belige later the same day.  This shorter conversation went as follows:

**B:** Hello.

---

[2]  Rave was assigned to work with an FBI narcotics task force.

**G:** Uh what's up uncle, it's me Fernando.

**B:** Talk to me Fernando.

**G:** Oh I couldn't do that. It didn't work out for me. I need you to just to - just for 19.

**B:** Oh but it doesn't work out that way.

**G:** It doesn't work out? Yeah, but he'll leave in the morning and the guy has them but I wasn't able to get them.

**B:** What was that?

**G:** He didn't want to-go lower.

**B:** Damn, that's rough that way. That's not much profit.

**G:** Yeah?

**B:** There's no profit there.

**G:** What did you say?

**B:** That there's not much profit there.

**G:** Yeah.

**B:** Uh.

**G:** No, well think about it-if you want and I'll look for another guy to see what comes up, if you're a go call me that those are there.

**B:** Well then. Uh, then when would that be here?

**G:** Yeah, he's-he would be leaving in the morning and arrives Saturday in the afternoon or Sunday morning.

**B:** Uh. Well, then come over to help you out.

**G:** Yeah?

**B:** Come over to help you out.

**G:** Oh then thank you man.

**B:** Okay.

**G:** Alright.

Detective Rave decoded this conversation to mean that Gonzalez could go no lower than the $19,000 per kilogram price discussed earlier in the day. Despite the protest about the small profit, Belige agreed after Gonzalez informed him that a courier would leave the next morning (a Wednesday) and deliver the cocaine to Belige Saturday or Sunday.

On the following Monday, January 30, surveillance personnel observed Severino enter Belige's liquor store. He left

the liquor store in his car, followed by a car with Colorado license plates. The Colorado car went into a warehouse at Severino's place of business. The driver of the Colorado car -- later determined to be Gonzalez's cousin, Adelberto Gonzalez -- left about an hour later. He was followed by federal agents to a nearby hotel. Later that day, agents approached Severino and obtained permission to search the warehouse, where they seized a duffel bag containing 11 sealed packages of cocaine, package sealing materials, and gasoline soaked wrappings and rags, which police theorized were used to protect the cocaine that had been hidden in the Colorado car's gas tank during transit.

After seizing the cocaine, police arrested Belige and Adalberto Gonzalez. At the request of the police, Belige called appellant to tell him that he and appellant's cousin had been arrested. Detective Rave subsequently called appellant, identifying himself as a police officer. During this conversation -- which took place in Spanish -- Gonzalez acknowledged that he had discussed the arrest with Belige. He admitted his status as the middleman for the Colorado distributors and the tasks he did for them, as well as the fact that he had negotiated the sale to Belige and enlisted his cousin to be the drug courier.

Gonzalez was indicted on one count of conspiring to distribute and possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and

846, and one count of aiding and abetting the distribution and possession with intent to distribute the same amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2.

The jury convicted Gonzalez on both counts after a three-day trial. He was sentenced to 240 months' imprisonment on each count, to be served concurrently. This timely appeal followed.

## II. LEGAL ANALYSIS

A. Competency

Gonzalez first argues that he is entitled to a new trial because the district court wrongfully denied his request for a competency examination and the related request for a continuance. The relevant facts may be sketched briefly.

On the day of jury selection, Gonzalez arrived at court in his jail-issued clothes, contrary to the advice of his attorney and the magistrate judge, who also discussed with him the potential negative ramifications of his choice of attire. Gonzalez said simply that he "just wanted to" wear the jail clothes. His attorney indicated that Gonzalez was going forward to trial against his advice -- and despite "strong" evidence against him -- because Gonzalez feared for his family's safety from members of the drug cartel with whom he had associated if he pled guilty and cooperated. A jury was selected, and trial was scheduled to begin two days later, February 8, 2007.

The next day, however, defense counsel filed motions seeking a competency hearing for Gonzalez and a continuance. The basis for the motions was an incident which occurred at the detention facility where Gonzalez was being held, in which he cut his wrists seriously enough to require transport to a hospital and sutures to repair the damage. He was seen by a staff psychologist before being taken to the hospital. Both the apparent suicide attempt and Gonzalez's prior refusal to wear civilian clothes to court were given as reasons to question Gonzalez's competency to stand trial.

The district court held a brief hearing[3] on the competency issue. The judge asked defense counsel whether a pre-hearing conversation with Gonzalez demonstrated that he was unable to understand why he was in court, unable to communicate with or assist defense counsel or unable to participate in the trial. Counsel indicated that Gonzalez knew why he was in court and that he was communicating, although "he might not be focused on assisting counsel." The judge also asked a Deputy Marshal with knowledge of the incident for information on Gonzalez. He stated that Gonzalez had told the staff psychologist during a five-minute examination that he was not seeking to end his life, and that he

---

[3] A full-blown hearing, pursuant to 18 U.S.C. § 4241(a), would involve the presentation of evidence, generally including testimony of mental health professionals after examining the defendant. See, e.g., United States v. Soldevila-Lopez, 17 F.3d 480 (1st Cir. 1994).

was instead reacting to his pre-trial confinement and fears for his family's safety. The Marshal also told the judge that jail personnel with whom he had spoken had told him that Gonzalez understood "what's going on," and had not acted in any sort of delusional way. Finally, the judge spoke directly to Gonzalez, who said that he understood the roles of the judge, jury and attorneys.

The court denied both the motion to continue and the request for a competency examination and hearing. She found "absolutely no indication . . . that this Defendant has in the past exhibited any symptoms of mental disease or defect." She added that she found no "indication that [Gonzalez] is now mentally incompetent, that is, unable to understand the nature and consequences of the proceedings . . . or to assist properly in his defense." The judge also noted the stress Gonzalez was under due to the charges against him, and concluded that his apparent suicide attempt alone, without any other indicia of a mental disease or defect, was insufficient to warrant a competency evaluation.

The court re-visited the competency issue after the jury's verdict, in connection with Gonzalez's motion for new trial. At that time, the court considered information in the Presentence Report prepared by the Probation Department. In an interview, Gonzalez denied any history of mental illness, said that his suicide attempt was a result of his "situation," and was "out of character" for him. He also denied any subsequent suicidal

impulses, noting that while he was emotionally upset about his conviction and worried about his family, he was not depressed and would not harm himself. In denying the new trial motion, the district court reiterated its pre-trial decision, further supporting the decision with the observation that Gonzalez had communicated with his counsel during the trial.[4]

A defendant's due process right to a fair trial includes the right not to be tried, convicted or sentenced while incompetent. United States v. Drope, 420 U.S. 162, 172-73 (1975). Pursuant to 18 U.S.C. § 4241(a), the district court must have a hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature of the proceedings against him or to assist properly in his defense." See also Dusky v. United States, 362 U.S. 402 (1960). We review the district court's decision not to hold a full competency hearing for abuse of discretion. We will

---

[4] While Gonzalez's one self-abusive incident should not be discounted, in our view neither the judge's amply supported findings nor the defendant's own statements suggest the "serious mental illness" that our concurring colleague finds to be present.
Additionally, we do not agree that the concurrence's unadorned description of the defendant's crimes as "nonviolent" adequately captures the risks associated with significant drug distribution operations, either for the authorities who investigate them or for society at large. See, e.g., United States v. Scott, 270 F.3d 30, 41 (1st Cir. 2001) (although large-scale drug trafficking may itself be nonviolent, the crime is commonly associated with violence).

affirm so long as there was a sufficient evidentiary basis to support the decision. United States v. Bruck, 152 F.3d 40, 46 (1st Cir. 1998).

Gonzalez points to Soldevila-Lopez, in which we reversed the district court's decision to deny a continuance and psychological evaluation of a defendant awaiting sentencing. 17 F.3d at 490. In that case, however, the district court had already granted the defendant's motion for a hearing and evaluation but then denied a subsequent request for further examination to respond to a court appointed psychologist's eleventh-hour addendum that the defendant was malingering. Id. at 482. We found error in the denial of the request for follow-up in light of the new information from the psychologist. Id. at 489. In addition, not only was the trail of events in Soldevila-Lopez decidedly dissimilar to those presented here, but also the defendant in that case had a history of psychiatric illness and had been under medical care for his condition, two factors not present here.

The district court addressed both Gonzalez and his attorney before the trial and again after the verdict, in connection with his motion for new trial. The salient details of those inquiries have already been laid out, and in our view the trial judge's conclusions were well-supported by the evidence before her. Gonzalez had no prior history of mental health problems. He was able to communicate with the court before trial,

-11-

and he indicated his understanding of the proceedings about to begin. Defense counsel provided no indication that Gonzalez would be unable to participate in his defense, and in fact the court observed Gonzalez doing so. The court also had the benefit of the information from the Marshal, the prison psychologist and the probation department interview. Against this backdrop, we conclude that the district court was not required to order a competency hearing and thus did not abuse its discretion in denying either the motion for a hearing or the continuance motion that was predicated on the need for an evaluation and hearing. The court's rulings were not an abuse of discretion.

## B. Evidentiary rulings

Gonzalez claims that evidence was improperly admitted against him. We review the district court evidentiary rulings for abuse of discretion. United States v. DeCologero, 530 F.3d 36, 58 (1st Cir. 2008).

First, Gonzalez argues that the eleven packages of cocaine seized at the warehouse, along with the packaging materials, were improperly admitted into evidence because there was no "relevant connection" between those items and Gonzalez. This argument is, at least in part, premised on a claim that Detective Rave's testimony should have been excluded because he was not sufficiently proficient in Spanish such that his translation of Gonzalez's confession could be deemed accurate, and that Rave's

decoding of the intercepted phone calls between Gonzalez and Belige was inadmissible.

Turning first to Detective Rave, we note that the district court conducted a voir dire, at which it was determined that Spanish is Detective Rave's native language, he speaks it fluently and understands multiple dialects, and Spanish is spoken in his own household. He also testified that he has served as a translator many times. Gonzalez relies on the fact that Rave had no formal Spanish education since grammar school, and that he is not certified as a translator or interpreter. He also argues that Rave's testimony is legally flawed because he waited more than two weeks to transcribe his notes of his conversation with Gonzalez.

We discern no abuse of discretion in the court's decision to allow Detective Rave's testimony. The court was presented with considerable evidence of Officer Rave's fluency. Gonzalez provides no legal support for his apparent theory that only certified translators may provide such testimony, nor can we locate any. In the end, we see this argument as one more properly directed to the weight of the evidence, not its admissibility. See Cummings v. Std. Register Co., 256 F.3d 56, 65 (1st Cir. 2001) (while shortcomings in certain testimony might reduce its probative value, they do not necessarily render it inadmissible). We therefore find no abuse of discretion.

Similarly, we reject Gonzalez's claim that the trial judge should have excluded Detective Rave's interpretation of the coded language in the intercepted phone calls. Citing no authority, Gonzalez essentially argues that the jury should have rejected Rave's understanding of ambiguous conversations. This is a classic weight versus admissibility argument that goes nowhere. There was no abuse of discretion in admitting Rave's testimony.

Having disposed of these preliminary evidentiary claims, our conclusion as to the admissibility of the cocaine and its packaging is not difficult to reach. Gonzalez's recorded conversations with Belige placed him squarely in the deal, and his confession to Rave was all the evidence necessary to show that his cousin, acting on Gonzalez's orders, brought the cocaine to Rhode Island, where it -- and the wrappings used to hide it during transit -- were located. Gonzalez's rebuttal argument is ostensibly limited to noting that nobody actually saw the cocaine unloaded from the cousin's vehicle inside the warehouse. The jury rejected this argument, as it was free to do. Accordingly, there was no error in the admission of the cocaine or packaging.

C. Sufficiency of the evidence

Because the entirety of Gonzalez's sufficiency argument is premised on the evidentiary claims we have already rejected, we have little trouble concluding that, in the light most favorable to the verdict, a rational jury could have found him guilty beyond a

reasonable doubt.  United States v. Garcia-Carrasquillo, 483 F.3d 124, 129-30 (1st Cir. 2007).  In sum, Gonzalez was overheard arranging the drug deal, the drugs were seized, and he confessed his involvement.  The verdict was thus sufficiently supported by the evidence.

D. Sentencing

Gonzalez makes several arguments regarding his twenty-year sentence.  First, he claims that the prosecution, by filing a sentence enhancement information[5] on the eve of trial, unconstitutionally burdened his right to a jury trial by essentially penalizing him for choosing to go to trial.  The information, which noted two prior drug felony convictions under California law, subjected Gonzalez to a mandatory minimum sentence of 20 years.  See 21 U.S.C. § 841(b)(1)(A). Gonzalez supports his argument by relying on United States v. Green, 346 F. Supp. 2d 259 (D. Mass. 2004), in which the district court imposed a reduced sentence in part because the government changed its position on various sentence enhancements after plea bargaining collapsed.  Id. at 329-30.  Gonzalez, however, fails to note that to the extent relevant here, we reversed the district court's sentencing in Green in United States v. Yeje-Cabrera, 430 F.3d 1 (1st Cir. 2005).  Our comment there is dispositive here:  "A defendant simply has no

_____

[5]  Under 21 U.S.C. § 851, the government must file an information with the court if it intends to seek an increase in a defendant's sentence based on a prior conviction.

-15-

right to a sentence, after trial, that is as lenient as a sentence he could have had earlier in a plea bargain." Id. at 26-27. See also, United States v. Jenkins, 537 F. 3d 1, 3-4 (1st Cir. 2008) (absent evidence of prosecutorial vindictiveness, there is no due process violation when government files § 851 information after failure to reach plea agreement in which government would have agreed not to file information).

Next, also relying on Green, Gonzalez argues that the use of the § 851 information unconstitutionally violates the Separation of Powers Doctrine, because it places too much sentencing power in the hands of the prosecutor. Gonzalez cites no pertinent authority for his position, which has been explicitly rejected by at least three other circuits. See United States v. Watford, 468 F.3d 891, 911 (6th Cir. 2006); United States v. Jensen, 425 F.3d 698, 707 (9th Cir. 2005); United States v. Cespedes, 151 F. 3d 1329, 1332-34 (11th Cir. 1998). Each of these cases relied on United States v. LaBonte, 520 U.S. 751 (1997), in which the Court noted that a prosecutor's ability to affect sentencing "is similar to the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect. Such discretion is an integral feature of the criminal justice system, and is appropriate, so long as it is not based on improper factors." Id. at 761-62. We join the three other circuits in holding no viable

-16-

Separation of Powers claim is presented by the defendant's argument.

Gonzalez next argues broadly that mandatory minimum sentences violate his right to due process because they remove the trial judge's sentencing discretion. However, it is beyond cavil that Congress has the power to set statutory minimum and maximum sentences to which courts must adhere. Chapman v. United States, 500 U.S. 453, 467 (1991).

Finally, Gonzalez argues that his sentence must be reversed because his prior convictions were not proved beyond a reasonable doubt. In so doing, he argues against the continuing viability of Almendarez-Torres v. United States, 523 U.S. 224 (1998). This argument is a non-starter, for "whatever the continuing viability of Almendarez-Torres, we have previously held that we are bound to follow it until it is expressly overruled." United States v. Jimenez-Beltre, 440 F.3d 514, 520 (1st. Cir. 2006) (en banc), cert. denied, 127 S. Ct. 928 (2007).

Appellant's arguments having been rejected, his conviction and sentence are **affirmed.**


**-Concurring Opinion Follows-**

**MERRITT, Circuit Judge, concurring.** I concur in the Court's opinion, but I agree with the District Court that the prosecution's decision to seek a mandatory sentence of 20 years under 21 U.S.C. § 851 passes all understanding. The District Court said: "I recognize you [AUSA] do this at the behest of your superiors. But I can't sit here today and impose this sentence without saying it's wrong, and you can take that message to whoever you think might listen." The Judicial Conference of the United States for almost 20 years, and the Sentencing Commission for almost 10 years, have pleaded with the judiciary committees of Congress to do something about the serious injustices that these long, mandatory minimum sentences impose — to no avail. This is a 20-year sentence for a nonviolent crime by a defendant with a serious mental illness. His incarceration will cost the American taxpayers in today's dollars somewhere between $600,000 and $1,000,000. With some carefully monitored rehabilitation treatment, it is possible that he could be released in just a few years. Like the District Judge, I think that the prosecution's purely discretionary decision to ratchet up this sentence to 20 years is misguided and ought to be reconsidered when the judgment becomes final.