# United States Court of Appeals
## For the First Circuit

No. 09-1811

UNITED STATES OF AMERICA,

Appellee,

v.

DURRELL WILLIAMS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Howard, Circuit Judges.

Paula D. Silsby, United States Attorney and Renée Bunker, Assistant United States Attorney, on brief for appellee.
Sarah A. Churchill and Strike, Goodwin & O'Brien on brief for appellant.

December 28, 2010

**HOWARD**, **Circuit Judge**.  A jury convicted Durrell Williams on numerous drug and gun charges.  The district court sentenced him to twenty-five years in prison.  On appeal Williams contends that his court-appointed attorney was given inadequate time to prepare for trial and that the government's evidence was insufficient to convict him.  He also asserts that his sentence was unreasonable and suffered from computational errors.  After careful review, we affirm in all respects.

## I.  BACKGROUND[1]

An inter-agency sting nabbed Williams for heading a drug and gun conspiracy in Portland, Maine.  We briefly describe the scheme.  Originally from Queens, a borough of New York City, Williams moved to Portland at some point in 2004 or 2005 to sell crack cocaine.  There he met Maine native Joshua Hebert and other middlemen who facilitated distribution.  Williams also sold directly to users, sometimes from his apartment, sometimes in a car driven by his then-girlfriend Sherina Howard, with whom he lived, and from time to time on his bicycle.  He used part of his drug proceeds to purchase handguns.  His main gun supplier was Wade Collett, a firearms-dealer licensee of Red Wheel Enterprises in Falmouth, Maine. Because Williams was a felon, he employed intermediaries as straw purchasers to buy guns on his behalf.  At times, Hebert would

---

[1]We review the facts in the light most favorable to the jury's verdict.  United States v. Gonzalez-Ramirez, 561 F.3d 22, 24 (1st Cir. 2009).

purchase a gun from Collett, create a false bill of sale that identified someone other than Williams, and then convey the gun to Williams instead of the individual identified on the bill of sale. At other times, Williams would accompany another associate to Collett's gun shop. There Williams would tell the individual which gun to buy, that person would ask to "borrow" money from Williams, and Collett would process the transaction knowing the gun was for Williams. During the course of the conspiracy, Williams traveled to Queens numerous times in order to "re-up" (i.e., obtain more crack) and sell the guns he had acquired in Maine.

In June 2008, Williams and Collett were indicted on several gun charges in federal district court in Maine. Collett entered into a plea agreement, but Williams did not. The government later filed a superceding indictment, again charging Williams with the gun violations, as well as charging Williams and Hebert with a drug-trafficking conspiracy involving fifty or more grams of cocaine base. Like Collett, Hebert agreed to plead guilty, but a second round of plea negotiations with Williams failed. Williams's trial was scheduled to begin on January 28, 2009, but was later rescheduled to February 17 due to defense counsel's illness. In mid-January, it became clear that counsel's illness would prevent him from continuing to represent Williams. The court, with Williams's consent, appointed another lawyer from the same firm. Although new counsel Sarah Churchill had already met with Williams,

she was away on a pre-scheduled vacation at the time of the appointment. The court continued trial until February 23, 2009, so that Churchill would have an additional week to prepare. In doing so, however, the court admonished that "I want to get this matter tried. [Williams has] been sitting there for some time."

On February 13, 2009, Churchill filed another motion to continue trial. She cited the "voluminous" material the government had produced, consisting of "six compact disks containing approximately 700 pages of written material and two compact disks which contain hours of recording of telephone calls," and suggested that more time was necessary "to ensure that proper cross-examination can occur." The court denied the motion in a paperless order, but invited Churchill to request additional time "[s]hould Counsel [a]pprehend during [t]rial there exists any prejudice from this Order."

After a three-day trial, the jury convicted Williams on all counts. The court sentenced him to 300 months on the drug charge, to be served concurrently with lesser time he received on the gun charges. Williams appealed.[2]

---

[2]Churchill represented Williams on appeal through briefing. Two weeks before we were to hear argument, Williams filed a grievance against Churchill with the Maine Board of Overseers criticizing her advocacy at trial and on appeal. The next day Churchill moved to withdraw as counsel for Williams. We granted Churchill's motion to withdraw, provided for the appointment of substitute counsel, and removed the case from the oral argument calender; at the time, however, we reserved decision on whether to reschedule oral argument or take the case as submitted on the

**II. DISCUSSION**

**A.  Motion to Continue Trial**

Williams argues that four weeks was not enough time for Churchill to prepare for trial in light of the materials she needed to review.  Williams also argues that additional time could have "improved" Churchill's impeachment of some of the government's witnesses.  In particular, Williams postulates -- for the first time on appeal -- that more time might have allowed Churchill to obtain a record showing that Williams was incarcerated in New York from September 2004 to May 2005 in connection with an unrelated charge.  According to Williams, if obtained that record would have discredited "several" of the government's witnesses, all of whom (we are told) testified that Williams was in Maine during that period.

We review the district court's denial of a motion to continue for abuse of discretion.  United States v. Mangual-Santiago, 562 F.3d 411, 429 (1st Cir. 2009).  Each case must be evaluated on its own facts.  United States v. Torres, 793 F.2d 436, 440 (1st Cir. 1986).  Relevant factors in our analysis include "the reasons contemporaneously presented in support of the request, the amount of time needed for effective preparation, the complexity of the case, the extent of inconvenience to others if a continuance is granted, and the likelihood of injustice or unfair prejudice

briefs.  We now determine that oral argument is unnecessary, see Fed. R. App. P. 34(a)(2), and proceed to resolve the appeal.

-5-

attributable to the denial of a continuance." United States v. Rodríguez-Durán, 507 F.3d 749, 763 (1st Cir. 2007) (citing United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995)).  To show abuse, the aggrieved party must establish that "the court exhibited an 'unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'" Id. (quoting United States v. Rodriguez-Marrero, 390 F.3d 1, 21-22 (1st Cir. 2004)). "Identifying prejudice from the ruling is essential." Id. (citing Saccoccia, 58 F.3d at 770).

Williams has not shown that an abuse occurred.  Attorney Churchill moved for a continuance on the basis of a broad assertion that the material she needed to review -- 700 pages of documents and "hours" of recorded telephone calls -- was voluminous.  Other than volume, no specific explanation has been provided as to why those particular materials justified additional time.  On the basis of this broad assertion alone, we are reluctant to second-guess the district court's conclusion that four weeks was adequate, especially in light of the court's previous continuance to accommodate her. See, e.g., Rodríguez-Durán, 507 F.3d at 767 (denial of continuance no abuse when counsel had about a month to review approximately 1000 pages of documents).

We note that the case against Williams was not overly complex.  Although the superceding indictment contained thirteen counts against Williams and involved nearly forty discrete

-6-

allegations, they all pertained to one conspiracy involving a limited number of individuals and two related schemes (pedestrian drug activity and gun transactions which were themselves substantially similar). The trial was short, lasting only three days from opening arguments to verdict. See, e.g., United States v. Waldman, 579 F.2d 649, 653 (1st Cir. 1978) (denial of continuance not an abuse in case involving a fifty-eight count indictment and eight-day trial). Moreover, Churchill did not shoulder that burden alone: a colleague, who presumably took part in trial preparation, was present throughout trial and cross-examined about half of the government's witnesses. Cf. United States v. Hurley, 63 F.3d 1, 16 (1st Cir. 1995) (denial of continuance no abuse in part because counsel benefitted from work of co-defendants' counsel).

Additionally, we discern no unfair prejudice. Williams's prejudice argument on appeal focuses on the purported existence of a record of his incarceration that, he claims, Churchill could have obtained if only the court had allowed the continuance. None of this, however, was presented to the district court in the first instance. Although sometimes prejudice might become clear through hindsight alone, see Rodríquez-Durán, 507 F.3d at 765, this is not one of those cases. According to the appellant's brief, Churchill learned shortly before trial that at least one government witness would testify that Williams was in Maine as early as 2004. Churchill then attempted to obtain a record of Williams's

incarceration for impeachment purposes, but that attempt failed for reasons that remain unclear. The salient point, though, is that -- despite the court's open and express invitation to renew the motion to continue when presented with cognizable prejudice -- counsel never sought a continuance to obtain the record that Williams now invokes.

In any event, we also reject the prejudice hypothesis on its merits. In United States v. Bruck, a case involving roughly comparable circumstances, we affirmed the denial of a continuance to develop psychological evidence. 152 F.3d 40 (1st Cir. 1998). Recognizing the defendant's history of psychological illness, the district court had ordered a psychological examination, which concluded that the defendant was competent to stand trial. Id. at 45-46. On the eve of trial, the defense sought a continuance to obtain additional evidence showing that the defendant was insane. Id. The court denied the continuance, and we affirmed:

> Bruck has made no effort to point us to evidence suggesting that he had a diminished capacity to form criminal intent and/or that he was legally insane at the time he committed his crimes. All he has done is to emphasize that there is evidence he never obtained . . . that might have assisted him in generating a last minute, mens rea-related defense. This argument is plainly insufficient for us to find an abuse of discretion on this record . . . . In so ruling, we also note Bruck's apparent lack of diligence in failing to secure the missing evidence in the two and one-half years since his trial, despite the fact that the extent to which the moving party may have been prejudiced by the denial of a motion to continue is one of the factors we look to in assessing whether the lower court acted within its discretion.

-8-

Id. at 46-47. Accord United States v. Warshak, Nos. 08-3997, 08-4085, 08-4087, 08-4212, 08-4429, 09-3176, 2010 WL 5071766, at *24 (6th Dec. 14, Cir. 2010) (no prejudice resulting from denial of continuance when defendant argued that more time might have revealed exculpatory evidence).

Similarly, here: Williams's phantom record remains missing even today, nearly two years after his trial, and speculation about what assistance it might have rendered to his defense falls hopelessly short of establishing, as he must, a likelihood of prejudice.[3]

The short of it is that, based on the record before us, the district court acted well within its discretion in refusing any further delay.

## B. **Motion for Acquittal**

During trial, Williams moved unsuccessfully for acquittal at the close of the evidence. See Fed. R. Crim. P. 29. On appeal, Williams argues that two witnesses, his former girlfriend Howard and one Ortiz, were "impeached to such a degree that no rational jury could have believed them." For this reason, and based on other

---

[3]We hasten to add that Williams makes too much of his purported incarceration in any event. It was not an alibi. At best, it could have impeached one government witness, Jose Ortiz, who testified that Williams was in Maine as early as 2004. Several other key government witnesses, however, testified almost uniformly that their dealings with Williams began in mid 2005 or later, which is after Williams claims he was released from prison.

alleged deficiencies of the government's "various witnesses," Williams claims that he should have been acquitted on the drug charge.[4]

We quickly dispatch this argument. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." Id. Instead, "a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace." Id. (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988)). See also Harriman v. Hancock County, No. 09-2284, 2010 WL 4923541, at *4-*5 (1st Cir. Dec. 6, 2010) (applying Zannino and holding that underdeveloped arguments on appeal are deemed waived).

Williams's argument here consists of a single three-sentence paragraph. In it, he claims broadly that Ortiz and Howard cannot be believed based on impeachment that he does not describe in any meaningful detail. Likewise, he claims that testimony from other witnesses, none of whom he identifies, cannot support his conviction based on inconsistencies and other issues that he too

---

[4]Williams does not argue that the district court erred in denying his Rule 29 motion as to the gun charges.

does not adequately describe.  Because his skeletal argument is plainly insufficient, we deem it waived.[5]

**C.    Sentencing**

Williams challenges his sentence on several grounds.  We examine each in turn, with reference to the 2008 U.S. Sentencing Guidelines Manual ("U.S.S.G.").  See United States v. Roa-Medina, 607 F.3d 255, 257 (1st Cir. 2010) (examining sentencing challenge based on guidelines in effect at time of sentence).

First, Williams argues that the district court miscalculated the drug quantity attributable to him for purposes of establishing his base offense level.  According to Williams, Hebert testified that he purchased from Williams anywhere from 3.5 to fourteen grams of crack per week (and, on one occasion, forty grams) over a two-month period.  By Williams's estimate, that totals sixty-eight grams.[6]  But the revised presentence investigation report (PSI Report), which the district court adopted, calculated drug quantity

---

[5]We note that if we were to reach the merits of his argument, we would easily reject it.  Reading the record in the light most hospitable to the government, and resolving credibility issues in favor of the verdict, we see more than enough evidence to support the jury's determination that Williams participated in a drug-trafficking conspiracy involving fifty or more grams of cocaine base.  See United States v. Cruz-Rodríguez, 541 F.3d 19, 26 (1st Cir. 2008) (reciting standard of review for assessing sufficiency).

[6](3.5 grams/week * seven weeks) + (forty grams) + (3.5 grams) = sixty-eight grams.  The seven-week figure is presumably based on the assumption that there are four weeks in each month and that the baseline time period, from which one week is subtracted, is two months.

-11-

based Hebert's purchases over a three-month period.  With the additional month included, the PSI Report estimated 85.15 grams.[7] This difference of 17.15 grams is significant because, if it were subtracted from the total drug-quantity estimate (164.35 grams), the revised estimate would fall just shy of 150 grams (147.2 grams, to be precise).  Consequently, Williams's base offense level would be two levels lower.  See U.S.S.G. § 2D1.1(c)(4).

We review a sentencing court's drug-quantity calculations for clear error.  United States v. Cintron-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010).  Generally, "we must honor such findings 'unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made.'"  United States v. Platte, 577 F.3d 387, 392 (1st Cir. 2009) (quoting Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 152 (1st Cir. 1990)).  "The calculation of drug quantities is not an exact science, and a sentencing court charged with that responsibility need not be precise to the point of pedantry.  Rather, a sentencing court may make reasoned estimates based on historical data."  Id.  See also United States v. Kinsella, 622 F.3d 75, 86 (1st Cir. 2010) (recognizing that a sentencing judge "is not required to be a mathematician or to make findings with computerized certainty").

---

[7](3.5 grams/week) * (4.3 weeks/month) * (three months) + (forty grams) = 85.15 grams.

Under this deferential standard, we see no error in the district court's drug-quantity calculations. True, Hebert at one point testified that he bought crack from Williams "for a couple of months." But during trial the government admitted bills of sale related to firearm transactions that book-end Hebert's dealings with Williams to about a three-month period. It was reasonable for the court to infer that throughout that period Hebert was buying crack from Williams in addition to selling him guns. Hebert's testimony does not contradict that evidence in any event. While logic dictates that two is not three, the court was free to interpret Hebert's statement idiomatically; in that light alone, and certainly in light of the other evidence, three months is a perfectly justifiable construction of "a couple of months."

Second, Williams challenges a two-level increase for possession of a firearm in connection with drug trafficking, see U.S.S.G. § 2D1.1(b)(1), and another two-level increase for asking his ex-girlfriend, Howard, to perjure herself before the grand jury, see U.S.S.G. § 3B1.1(a). Williams supports these challenges with the following blanket statement: "These findings are not supported by the record." That declaration is not enough. We therefore deem them waived. Zannino, 895 F.2d at 17.

Third, he argues that the court placed him in the wrong criminal history category. According to Williams, he should have received one, rather than two, criminal history points stemming from

-13-

a youthful offender adjudication on a New York robbery charge, see U.S.S.G. § 4A1.1(b), and no points at all (rather than the one point assigned) for a New York reckless endangerment charge, see U.S.S.G. § 4A1.1(c).  Because this would decrease his total criminal history points to eight from ten, Williams concludes that the court should have calculated his sentence based on a criminal history category of IV instead of V.  We see no error in either assignment of points.  Although Williams's youthful offender adjudication originally resulted in only probation, the court correctly assigned two criminal history points based upon the sentence imposed when that probation was revoked.  U.S.S.G. § 4A1.2(k)(1).  The sentence upon revocation was imposed the same day as a one-year sentence for drug possession, which the court also correctly counted separately. U.S.S.G. § 4A1.2 cmt. n.11.  As to the second argument, Williams offers no reason to disturb the court's determination that his conviction for reckless endangerment in the second degree (which involved fleeing in a motor vehicle from the police) entailed a degree of culpability and recurring criminal conduct dissimilar to mere reckless driving.  U.S.S.G. § 4A1.2 cmt. n.12.

Fourth, Williams argues that his variant sentence of 300 months was substantively unreasonable based on his youth and his previous sentences, which were far lower.[8]  The mandatory minimum of

---

[8]The government does not challenge the court's sixty-month downward variance.

240 months, he insists, would have been more than enough to serve the purposes of 18 U.S.C. § 3553(a). The district court enjoys wide latitude in sentencing decisions. United States v. Rivera-Gonzalez, No. 08-2142, 2010 WL 4905170, at *7 (1st Cir. Dec. 1, 2010). Ultimately, "the linchpin of a reasonable sentence is a plausible sentencing rationale and a defensible result." Id. (quoting United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008)).

We have no difficulty concluding that 300 months was a reasonable sentence for Williams's crimes. The court stated that this was "one of the more serious drug[-]gun offenses" it had encountered, and that Williams's gun and drug trafficking was a "volatile mixture" that raised serious public safety concerns. The court also noted that Williams's suborning of perjury, which occurred while he was incarcerated, undermined his statement during allocution that a lesser sentence would be equally rehabilitative. Nonetheless, the court twice recognized Williams's young age and stated that 360 months was "perhaps, extremely high" in light of his prior sentences, and so imposed a sentence that was sixty months below the guideline range. We are satisfied that this sentence was a reasonable one.

Fifth and finally, we permitted Williams to file a pro se supplemental brief based on his request "to make an argument in his own words to supplement the arguments already made by counsel." Williams's pro se supplemental brief seeks a remand for resentencing

in light of the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372, in which Congress adjusted the ratio of penalties for crack and powder cocaine offenses.[9]  Among other changes, Congress increased the amount of cocaine base a defendant must possess in order to trigger a mandatory minimum sentence of five or ten years.  Fair Sentencing Act § 2(a)(1), 124 Stat. at 2372.

Williams does not claim that he is entitled to benefit from the new mandatory minimum penalties, presumably because his sentence of 300 months was well above any applicable minimum.  Other courts to consider the issue have reasoned that the statutory changes wrought by the Fair Sentencing Act do not have retroactive effect and thus would not benefit a defendant in Williams's position, although that remains for now an open question in this circuit.[10]

---

[9]In addition to his sentencing argument described in text, he appears to argue that Churchill was ineffective under Strickland v. Washington, 466 U.S. 668 (1984), and its progeny; but that is a claim that must first be made in the district court under 28 U.S.C. § 2255.  See, e.g., United States v. Gonzalez-Vazquez, 219 F.3d 37, 42 (1st Cir. 2000) (reciting rule, collecting cases, and recognizing an exception not applicable here).

[10]See United States v. Reevey, No. 10-1812, 2010 WL 5078239, at *2-*4 (3d Cir. Dec. 14, 2010) (unpublished); United States v. Wilson, No. 10-4160, 2010 WL 4561381, at *2 (4th Cir. Nov. 12, 2010) (unpublished); United States v. Lewis, No. 09-3329, 2010 WL 4262020, at *3 (10th Cir. Oct. 29, 2010); United States v. Glover, No. 09-1725, 2010 WL 4250060, at *2 (2d Cir. Oct. 27, 2010) (unpublished); United States v. Brewer, 624 F.3d 900, 909 n.7 (8th Cir. 2010) (dicta); United States v. Bell, 624 F.3d 803, 814-15 (7th Cir. 2010); United States v. Carradine, 621 F.3d 575, 580 (6th Cir. 2010); United States v. Hall, No. 09-10216, 2010 WL 4561363, at *3 (9th Cir. Aug. 12, 2010) (unpublished).

Instead, his argument seems to be that he ought to be resentenced according to what he expects will be more favorable forthcoming sentencing guidelines.  Congress did indeed direct the U.S. Sentencing Commission to amend its guidelines to reflect the new crack-to-powder ratio, see Fair Sentencing Act § 8, 124 Stat. at 2374, but Williams's request is premature at this juncture.  The Commission has not yet issued new permanent guidelines, nor has it determined whether any new guidelines will have retroactive effect.  See U.S.S.G. § 1B1.10.(c) (not referencing emergency amendment to U.S.S.G. § 2D1.1(c), Amend. 748 (effective Nov. 1, 2010)).  If the Commission adopts retroactive changes to the guidelines that would benefit Williams, he is free to petition for resentencing pursuant to 18 U.S.C. § 3582(c)(2).

**Affirmed**.