**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 10-4198**
_____

UNITED STATES OF AMERICA,

               Plaintiff - Appellee,

     v.

TONY ALLEN GREGG,

               Defendant - Appellant.

_____

**No. 10-4199**
_____

UNITED STATES OF AMERICA,

               Plaintiff - Appellant,

     v.

TONY ALLEN GREGG,

               Defendant - Appellee.

_____

Appeals from the United States District Court for the Eastern District of Virginia, at Richmond.   James R. Spencer, Chief District Judge.  (3:09-cr-00180-JRS-1)

_____

Argued:  May 13, 2011           Decided:  June 17, 2011

_____

Before MOTZ, DAVIS, and KEENAN, Circuit Judges.

Affirmed in part, vacated in part, and remanded by unpublished opinion. Judge Keenan wrote the opinion, in which Judge Motz and Judge Davis joined. Judge Davis wrote a separate concurring opinion.

---

**ARGUED:** Alan Hideto Yamamoto, Alexandria, Virginia, for Appellant/Cross-Appellee. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee/Cross-Appellant. **ON BRIEF:** Brian S. Foreman, BOWEN, CHAMPLIN, CARR, FOREMAN AND ROCKECHARLIE, Richmond, Virginia, for Appellant/Cross-Appellee. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Roderick C. Young, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee/Cross-Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

KEENAN, Circuit Judge:

Tony Allen Gregg was convicted by a jury of conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base (crack cocaine), in violation of 21 U.S.C. §§ 841(a)(1), 846 (2006). The district court sentenced Gregg under § 841(b)(1)(A) to the mandatory term of life imprisonment required by the statute for a third conviction of a felony drug offense. Fifteen days after sentencing Gregg, the district court reduced Gregg's sentence to 300 months' imprisonment, based on a mistake in the government's information listing Gregg's prior convictions.

Gregg appeals his conviction, alleging that the district court erred in its response to a question submitted by the jury during its deliberations, and that the evidence was insufficient to support his conviction. On cross-appeal, the government asserts that the district court violated Federal Rule of Criminal Procedure 35 when the court modified Gregg's sentence. We affirm Gregg's conviction, but vacate his sentence and remand the case to the district court with instructions that the district court reinstate the statutory mandatory sentence of life imprisonment.

I.

The evidence at trial showed that on March 24, 2009, Detective Greg Russell of the Richmond Police Department detained Gregg outside the Deluxe Motel in relation to an investigation of an armed robbery. Gregg informed Detective Russell that Gregg "work[ed] for [Detective Erol] Fernandez," a member of the Department's Narcotics Division.[1] Suspecting drug activity, Detective Russell asked Gregg if he was carrying "anything . . . that shouldn't be there." Gregg admitted that he possessed drugs, and handed to Detective Russell a plastic bag containing about 3.57 grams of crack cocaine.

The government also presented evidence that on May 12, 2009, the Federal Bureau of Investigation (FBI) and the Richmond Police Department were cooperating in an investigation of gang activity at the Deluxe Motel. During this investigation, an FBI informant approached Gregg, who was present at the motel, in order to make a "controlled drug buy." At the time, Gregg had $900 in cash on his person but was not carrying any drugs. Therefore, the intended transaction did not take place. A

---

[1] Gregg was listed as an "informant" with the Richmond Police Department but had never performed any work for the Department. Gregg did complete six "controlled drug buys" for the Federal Bureau of Investigation, which "deactivated" Gregg after the March 24, 2009 incident. The Richmond Police Department "deactivated" Gregg in May 2009.

government witness testified that Gregg had borrowed the sum of $900 in order to purchase crack cocaine.

The next day, Gregg was arrested on federal drug charges. After waiving his Miranda rights, Gregg made a statement to FBI Special Agents. According to a report by Special Agent Scott Umphlett, Gregg admitted that he began selling crack cocaine in March 2009, and that he had planned to sell the drug at the Deluxe Motel on March 24, 2009. Gregg also stated that he sometimes sold several "eight balls" in a day.[2] Based on this representation, Special Agent Umphlett calculated "conservatively" that between March 24, 2009 and May 12, 2009, Gregg sold about 171.5 grams of crack cocaine.

The government also presented testimony from four witnesses who either had purchased crack cocaine from Gregg, or had knowledge of drug transactions involving Gregg. One of these witnesses, April Brooks, estimated that Gregg sold $1,500 or more of crack cocaine in an average day, and that Gregg purchased a new supply of drugs, or "re-upped," every two or three days. Brooks recalled that she had observed Gregg with as much as 14 to 27 grams of crack cocaine at one time. Another witness, Amy Lester, testified that she lived with a man who had

---

[2] An "eight ball" is 3.5 grams or one-eighth an ounce of cocaine.

supplied Gregg with drugs on between five and ten occasions during the period from March 2009 until May 12, 2009.

Phylicia Lewis, another witness presented by the government, testified that on three occasions, Gregg purchased crack cocaine for her to sell. Lewis also stated that "on a good day," Gregg could sell between one ounce and one and one-half ounces of crack cocaine, and she estimated that Gregg had four such "good days" each week. According to Lewis, on a "slow day," Gregg generally sold an amount of crack cocaine totaling between one quarter of an ounce and one-half of an ounce. Lewis further stated that Gregg sold drugs every day of the week.

FBI Special Agent Robert Scanlon testified that one ounce of crack cocaine weighs 28.3 grams. He calculated that a dealer who sells one ounce of crack each day would sell more than 50 grams in a two-day period. Special Agent Scanlon also testified that the quantity of crack cocaine that Gregg possessed on March 24, 2009, was more consistent with distribution than with personal use of the drug.

In his defense, Gregg presented testimony from his former probation officer, Mindy Grizzard-Applewhite. She stated that Gregg told her in March or April of 2009 that he "was hooked on drugs again," and that he needed her help. Grizzard-Applewhite stated that although she was no longer supervising Gregg at that

time, she tried to assist him in obtaining treatment but was unsuccessful.

## II.

At the close of the evidence, the district court instructed the jury that the government was required to prove beyond a reasonable doubt that Gregg "knowingly and voluntarily became a part of [a] conspiracy." During its deliberations, the jury inquired whether this language meant that the government also had to prove that Gregg "acted out the conspiracy in question." In answering this question, the district court reminded the jurors that it expressly had charged that "[t]he government [was] not required to prove that the parties or the members of the conspiracy were successful in achieving any or all of the objects of the agreement." The district court then stated,

> In this case, of course, the allegation is that the defendant was involved in a conspiracy to distribute and to possess with intent to distribute cocaine base. And the evidence, if you accept it, is that he actually sold cocaine base or possessed it with the intent to distribute. So it is not required that the conspiracy be successful or that the object of the conspiracy be borne out. But, of course, in this case you have to deal with the evidence that you have before you. Again, you can reject the evidence. But the evidence is there and you either credit it or you don't.

In response to these comments by the court, defense counsel stated, "I think the [jury's] question goes to did [Gregg]

7

accomplish the 50 grams or more as alleged in the indictment." Defense counsel asked the court to instruct the jury that the government must prove that Gregg "conspired with others to do more than 50 grams as alleged in the indictment." The district court refused the requested instruction.

On appeal, Gregg raises two challenges to the district court's response to the jury's question. Gregg contends that the district court erred by refusing to give a lesser-included offense instruction, and that the district court created prejudice in its response by effectively lending credence to the government's evidence. We address these arguments in turn.

A.

At the outset, we observe that Gregg did not request a lesser-included offense instruction in the district court, either before the jury began deliberations or when the district court responded to the jury's question. Rule 30(d) of the Federal Rules of Criminal Procedure provides that a party must assign error to an omission from the jury charge "before the jury retires to deliberate," by stating distinctly the grounds for the objection. When a claimed omission is not preserved in this manner, such omission is reviewed for plain error. See Fed. R. Crim. P. 52(b). To establish plain error, a defendant must demonstrate that the asserted defect in the trial in fact

8

constituted error, that the error was plain, and that the error affected the defendant's substantial rights. United States v. Jackson, 124 F.3d 607, 614 (4th Cir. 1997) (citing United States v. Olano, 507 U.S. 725, 732 (1993)).

In certain circumstances, the failure to give a lesser-included offense instruction may result in trial error when a jury suspects that a defendant is guilty of some offense, but when one of the elements of the crime charged is in doubt. In such a circumstance, absent a lesser-included offense instruction, the jury may fail to give full effect to the government's proof burden and resolve any doubts in favor of conviction. See Schmuck v. United States, 489 U.S. 705, 717 n.9 (1989). However, a criminal defendant is not entitled to a lesser-included offense in every case. Such an instruction is warranted only when the proof on the element in dispute, which differentiates the greater and lesser offenses, is sufficient to allow a jury to find the defendant innocent of the greater offense and guilty of the lesser offense. See United States v. Blankenship, 548 F.2d 1118, 1120 (4th Cir. 1976), cert. denied, 425 U.S. 978 (1976).

In the present case, Gregg maintains that that the district court should have instructed the jury regarding a "lesser quantity" of cocaine. He contends that the evidence at trial demonstrated that he personally used crack cocaine, that he was

9

not carrying large amounts of cash on March 24, 2009, or on May 12, 2009, and that he thought he was working as a government informant. According to Gregg, these facts call into question the government's proof that he conspired to distribute and possessed with intent to distribute 50 grams or more of crack cocaine.

We disagree with Gregg's characterization of the evidence. The evidence amply demonstrated that the quantities of crack cocaine that Gregg bought and sold far exceeded 50 grams. As described above, Special Agent Umphlett estimated that Gregg sold 171.5 grams of crack cocaine in the period between March 24, 2009 and May 12, 2009. Further, to the extent that Gregg suggests the district court should have instructed the jury regarding the offense of simple possession of crack cocaine, rather than conspiracy to distribute and possess with the intent to distribute 50 grams or more of crack cocaine, that argument also is foreclosed by the overwhelming evidence in this case, which included Gregg's confession that he sometimes sold several "eight balls" in a single day. A conclusion that Gregg merely possessed the drugs at issue for personal use cannot fairly be inferred from this record. Thus, because the evidence could not reasonably be construed to allow the jury to find Gregg innocent of the offense charged but guilty of a lesser-included offense, we hold that the district court did not err by failing to give a

10

lesser-included offense instruction.  See Blankenship, 548 F.2d at 1120.

B.

Gregg next argues that he was prejudiced by the district court's summary of the evidence in the above-quoted response to the jury's question.  We apply a plain error standard of review to this claim, because Gregg did not raise this objection before the district court.  See Fed. R. Crim. P. 52(b).

A district court generally may reference the evidence presented at trial to assist the jury in understanding the facts, but the court must exercise care not to usurp the jury's function as the ultimate trier of fact.  See United States v. Tello, 707 F.2d 85, 88-90 (4th Cir. 1983).  In this case, the district court stayed well within its proper role of supervising the fact-finding process.  The district court's recitation of the evidence in this case did not contain any expressed opinion regarding the evidence or the witnesses' credibility. Additionally, the district court emphasized contemporaneously with its comments on the evidence that the jury could accept or reject the evidence described.  See id.  The court also instructed the jury prior to trial that "[n]othing the Court may say or do during the course of the trial is intended to indicate nor should it be taken by you as indicating what your verdict

11

should be." Thus, we hold that the district court did not commit plain error in its remarks on the government's evidence.

III.

Gregg also argues that the evidence was insufficient to support his conviction. To prove the charge of conspiracy to distribute and possess with intent to distribute 50 grams or more of crack cocaine, the government was required to establish beyond a reasonable doubt that there was an agreement between two or more persons to distribute and possess with intent to distribute that amount of crack cocaine, that the defendant knew of the conspiracy, and that the defendant knowingly and voluntarily became a part of the conspiracy. United States v. Yearwood, 518 F.3d 220, 225-26 (4th Cir. 2008).

We examine Gregg's challenge to the sufficiency of the evidence under a well-established standard of review. We determine whether, viewing the evidence in the light most favorable to the government, there is substantial evidence to support the conviction. United States v. Kelly, 510 F.3d 433, 440 (4th Cir. 2007). We do not review the credibility of the witnesses, but assume that the jury resolved any inconsistencies in the evidence in the government's favor. Id. After considering all the evidence presented at trial, both direct and circumstantial, and upon according the government all reasonable

12

inferences from the facts shown, we will uphold a verdict if a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. United States v. Harvey, 532 F.3d 326, 333 (4th Cir. 2008); United States v. Collins, 412 F.3d 515, 519 (4th Cir. 2005).

Gregg asserts that the evidence shows only that he engaged in "buy-sell" transactions and does not support a conspiracy conviction. He also contends that the evidence established that he actually thought that he was working as an informant during the months in question. Upon our review of the record, we disagree with Gregg's arguments.

The government presented substantial evidence to permit a jury to convict Gregg of the crime charged. This Court previously has stated that evidence of a "buy-sell" transaction, combined with evidence of a substantial quantity of drugs, can support a reasonable inference of the existence of a conspiracy. See Yearwood, 518 F.3d at 226. Here, the testimony from law enforcement officers, the testimony from Gregg's acquaintances, Gregg's confession to FBI Special Agents, the undisputedly large quantity of crack cocaine involved, and the nature of Gregg's drug transactions during the period in question, were sufficient to permit a reasonable jury to find beyond a reasonable doubt that Gregg conspired to distribute and possessed with intent to distribute 50 grams or more of crack cocaine. Therefore, we

13

hold that the evidence was sufficient to support Gregg's conviction.

IV.

In its cross-appeal, the government argues that the district court violated Federal Rule of Criminal Procedure 35 when it reduced Gregg's sentence. The government contends in the alternative that the imposition of Gregg's initial sentence was not clear error, and that the district exceeded the fourteen-day limit of Rule 35(a) when it reduced Gregg's sentence beyond that authorized time period.

Rule 35(a) permits a district court, within fourteen days of sentencing, to "correct" a sentence that is based on an "arithmetical, technical, or other clear error." We consider this provision in the context of the various procedural actions that occurred in this case.

Before trial, pursuant to 21 U.S.C. § 851, the government had filed informations notifying Gregg of two prior convictions of felony drug offenses that would subject him to a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A) in the event of a third conviction. Gregg did not challenge the sufficiency of the government's documents or the validity of the underlying convictions. After the jury verdict in this case, the district

14

court sentenced Gregg to life imprisonment in accordance with 21 U.S.C. § 841(b)(1)(A).

The following day, the district court informed counsel that one of the informations filed by the government contained two mistakes. The relevant information stated: "On July 26, 1996, the defendant, TONY ALLEN GREGG, was found guilty of possession with the intent to distribute cocaine, a felony, in the Circuit Court fo[r] the City of Richmond, Virginia (Case # 96-691-F)." The district court explained that the original conviction order was entered on July 9, 1996, but was amended on July 26, 1996, and that the state circuit court corrected the conviction order a second time, in October 2000, to reflect that Gregg was convicted of simple possession of cocaine, not possession with the intent to distribute.[3] Thus, the information filed by the government under § 851 had stated incorrectly both the original conviction date and the offense of conviction. Based on these defects, the district court concluded that the government's information filed under § 851 was of questionable validity. Accordingly, fifteen days after sentencing Gregg to a term of life imprisonment, the district court reduced Gregg's sentence to a term of 300 months' imprisonment.

---

[3] The conviction of possession of cocaine also is a "felony drug offense" for purposes of triggering enhanced penalties under § 841(b).

We agree with the government that the defects in the government's information did not create any "clear error" in Gregg's sentence permitting a correction under Rule 35(a). The scope of circumstances constituting "clear error" that may be corrected under Rule 35(a) is narrow, and generally requires that some reversible error occurred in the original sentencing by the district court. United States v. Fields, 552 F.3d 401, 404 (4th Cir. 2009); see Fed. R. Crim. P. 35(a) advisory committee's note ("The authority to correct a sentence under [Rule 35(a)] is intended to be very narrow and to extend only to . . . errors which would almost certainly result in a remand of the case . . . .") (1991 Amendments). When a district court "unequivocally states a sentence and then imposes it, and the sentence is not the product of error, the district court has no authority to alter that sentence." United States v. Fraley, 988 F.2d 4, 7 (4th Cir. 1993).

The statutory purpose of an information filed under § 851 is to enable a defendant to identify, and to have the ability to challenge, the government's intended use of any prior conviction to support a sentencing enhancement. See United States v. Steen, 55 F.3d 1022, 1027 (5th Cir. 1995). Therefore, when the government timely provides in an information constitutionally-adequate notice of a defendant's prior convictions, a district

16

court may enhance a defendant's sentence in accordance with the contents of the information.  Id.

The information at issue in this case satisfied the protection afforded by § 851.  The information, which was filed in the district court before trial, identified the proper court of conviction, the correct case number, and the July 26, 1996 date on which the state circuit court entered the first corrected conviction order.  Moreover, there is no evidence in the record before us that Gregg had any difficulty identifying the conviction contained in the information.  Gregg has not asserted that he was unable to ascertain what conviction was referenced in the information, nor has he challenged the validity of the conviction itself.

In view of this record, and of Gregg's failure to show that he was unable to determine the nature of the conviction referenced in the government's information, we conclude that the mistakes in the information do not affect its content showing that Gregg was convicted of a felony drug offense as a result of the 1996 proceedings in the state circuit court.  Thus, we hold that Gregg's original sentence was not affected by the mistakes in the government's information, and that there was no "clear error" justifying a "corrected" sentence in this case.

Accordingly, we affirm Gregg's conviction, but vacate his sentence.  We remand the case to the district court with

17

instructions that the district court reinstate the mandatory sentence of life imprisonment provided under 21 U.S.C. § 841(b)(1)(A).[4]

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

---

[4] Because we hold that the district court lacked any basis under Rule 35(a) to correct Gregg's sentence, we need not address the government's alternative argument that the district court exceeded the time limitations of Rule 35(a) in changing Gregg's term of imprisonment.

DAVIS, Circuit Judge, concurring.

I concur fully in Judge Keenan's opinion for the panel and offer these additional comments.

A.

The distinguished district judge was aghast that the now forty-year-old Tony Gregg would spend the rest of his life in federal prison for selling small amounts of crack cocaine over a period of several weeks out of a hotel room in a run-down section of Richmond. See infra n.6. The judge uncovered (shortly after having imposed the mandatory life sentence) a seeming defect in the government's information filed pursuant to 21 U.S.C. § 851 and elected to reconvene the sentencing proceeding and to impose, instead, a twenty-five year, within Guidelines sentence. As the panel opinion makes clear, we are constrained to undo the district court's stab at achieving a more just sentence.

The record shows that Gregg was a classic "utility player" in America's forty-year "war on drugs": user, seller, "snitch." A tenth-grade drop-out (after repeating the second grade and the seventh grade) with four half-siblings, he began to use illegal narcotics in his early teens. For a time, he lived in an abusive family environment; later, he moved between his mother, grandmother, and father, sometimes in Virginia, sometimes in

19

Ohio. As a young man, he attempted suicide more than once (although he described the episodes as mere attempts to "get high"). Throughout his 20s and early 30s, he was in and out of jails and prisons on a regular basis, sometimes for assaultive behavior. He was convicted of illegal gun possession in 2001 and served a three-year federal prison sentence.

Later, once again released from incarceration and (according to his probation officer, who testified below) having adjusted reasonably well upon his return to free society, in consideration for unspecified monetary compensation, he became a highly-valued, highly-effective confidential informant for the Federal Bureau of Investigation's Violent Crime Task Force in Richmond, on whose behalf he engaged in half a dozen undercover drug transactions from mid-2008 through early 2009.

Sometime in early 2009, during his habitual association with drug users and dealers while working on behalf of the FBI to prosecute others involved in the drug trade, Gregg fell off the wagon and began to use and sell illegal narcotics again. As explained by Judge Keenan, he was unexpectedly accosted by Richmond robbery detectives (investigating crimes of which he was not suspected) while in possession of more than three grams of crack cocaine in March 2009; they seized the cocaine but did not arrest him. It was only weeks later, in May 2009, when Gregg himself became a target of an undercover drug sting by the FBI,

that he was finally arrested and prosecuted in this case. No doubt believing that he might be allowed to "work off" the March and May charges when he was interviewed by some of the very agents by whom he had recently been employed to make undercover drug purchases, Gregg promptly waived his <u>Miranda</u> rights and freely discussed his recent drug dealing activity.

Despite Gregg's countless arrests starting as a juvenile at age 15 and his criminal history category of V, the pre-sentence report in this case recites: "The defendant does not qualify for a sentence enhancement under Career Offender, Criminal Livelihood, Armed Career Criminal or Repeat and Dangerous Sex Offender sections . . . of the Sentencing Guidelines."

Why, then, a life sentence, the kind of sentence sometimes imposed on convicted murderers? Apart from what his lawyer described as official animus arising from Gregg having "embarrassed" the FBI by dealing drugs while on the Bureau's payroll, it appears that the federal prosecutors were told by Virginia state prosecutors that Gregg, who was for some period of time involved in the Crips gang (as the FBI full well knew at all relevant times), had "participated" in the murder of a high-volume Richmond drug dealer who was Gregg's supplier. J.A. 338-

39.[1] To be sure, so far as the record shows, no such evidence was ever presented in this case, either at trial or at sentencing. Furthermore, prior to trial, Gregg was offered a plea agreement for a twenty-year sentence; when he rejected the government's offer, the government went all out for the life sentence found to be unjust by the district court. Of the government's four non-law-enforcement witnesses at the one-day trial below, all four were women who were themselves, like Gregg, users and sellers of crack cocaine and heroin who worked with Gregg to sell crack cocaine.

Understandably, perhaps, to many, Gregg is not a sympathetic figure; they will think: he got what he deserved. To many others, perhaps, matters are not so clear. Indeed, many would say that Tony Gregg seems to be one more of the drug war's "expendables." See Nora V. Demleitner, "Collateral Damage": No Re-Entry for Drug Offenders, 47 Vill. L. Rev. 1027, 1050 (2002).

B.

This case presents familiar facts seen in courts across the country: a defendant addicted to narcotics selling narcotics in order to support his habit. Unfortunately for Gregg and

---

[1] In addition, because Gregg's first trial ended in a hung jury, the government was required to try him a second time.

countless other poorly-educated, drug-dependant offenders, current drug prosecution and sentencing policy mandates that he spend the rest of his life in prison. He is not alone: the United States currently has the highest rate of incarceration in the world. The Pew Ctr. on the States, One in 100: Behind Bars in America 5 (2008), available at http://www.pewcenteronthestates.org/uploadedFiles/8015PCTS_Prison08_FINAL_2-1-1_FORWEB.pdf. The United States also boasts the largest prison population in the world, with 2.3 million adult Americans behind bars.[2] Id.; see also Adam Liptak, More Than One in 100 Adults Are Now in Prison in U.S., N.Y. Times, Feb. 29, 2008, at A14. Further, Gregg, like most other drug offenders, has a drug dependence or abuse problem. Christopher J. Mumola & Jennifer C. Karberg, Bureau of Justice Statistics Special Report, U.S. Dep't of Justice, Drug Use and Dependence, State and Federal Prisoners, 2004, at 7 tbl.5 (2006), available at http://bjs.ojp.usdoj.gov/content/pub/ascii/dudsfp04.txt.

This staggering incarceration rate is traceable to the so-called "War on Drugs," which began in 1971 and picked up steam in the mid-1980s, when Congress decided to get "tough" on drug-

---

[2] The Pew Report figures do not take into account the number of juveniles currently in detention centers, which means that the total number of incarcerated Americans is higher still. Id.

related crime by imposing lengthy mandatory minimum prison sentences for offenders convicted of participating in the illegal drug trade. See Barbara Vincent & Paul Hofer, Fed. Judicial Ctr., The Consequences of Mandatory Minimum Prison Terms: A Summary of Recent Findings 4 (1994), available at http://www.fjc.gov/public/pdf.nsf/lookup/conmanmin.pdf/ $File/conmanmin.pdf; Paige Harrison & Allen Beck, U.S. Dept. of Justice, Prisoners in 2002 1 (2003), available at http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=921. To effectuate the change in drug policy, Congress passed the Anti-Drug Abuse Act of 1986, which allocated increased funding for drug enforcement and required mandatory minimum sentences for certain drug offenses. See U.S. Drug Enforcement Administration, 1985-1990, http://www.usdoj.gov/dea/pubs/history/1985-1990.html. The Anti-Drug Abuse Act of 1988 added additional funds for enforcement and similarly increased penalties for drug violations. Id. Finally, the Federal Sentencing Guidelines became effective on November 1, 1987, coinciding with the passage of the federal Anti-Drug Abuse Acts of 1986 and 1988. These laws created an array of mandatory minimum sentences for drug offenses, stripping away the discretion that judges traditionally employed in sentencing drug offenders and shifting sentencing authority to prosecutors through their charging decisions. As a result, the proportion of drug offenders

24

sentenced to prison swelled from 79% to 93% between 1988 and 2004, often for extraordinarily lengthy periods. Bureau of Justice Statistics, Compendium of Federal Justice Studies, 2004 (December 2006). In addition, the elimination of parole resulted in offenders serving much longer sentences than in the past. Marc Mauer & Ryan King, A 25 Year Quagmire: The War on Drugs and Its Impact on American Society 7 (2007).

The mass incarceration of drug offenders persists into the second decade of the twenty-first century despite the fact that research consistently demonstrates that the current approach to combating illegal drug use and drug trafficking is a failure. For example, one of the primary reasons for the war on drugs was to "create the proper incentives for the Department of Justice to direct its most intense focus on major traffickers and serious traffickers." Id. at 14. In other words, the new drug laws were intended to target offenders who import, control and manage the distribution of substantial quantities. However, the vast majority of drug offenders in the federal system are either street-level dealers, couriers, or low-level assistants. United States Sentencing Commission, Cocaine and Federal Sentencing Policy, May 2007, at 19. As Judge Sweet recently stated, lengthy incarcerations have "not been reserved for the worst offenders; the overall average sentence length for a federal drug offense ranges from 129 months for crack cocaine to 40.4 months for

marijuana, with the majority of cocaine and crack offenders subject to five- and ten-year mandatory minimums, despite the fact that the overwhelming majority of them, approximately 90% in 2005, committed no violence in connection with their drug crimes." Robert Sweet, Will Money Talk?: The Case For a Comprehensive Cost-Benefit Analysis of the War on Drugs, 20 Stan. L. & Pol'y Rev. 229, 230-31 (2009).

As the Federal Judicial Center concluded nearly twenty years ago, "the weight of the evidence clearly shows that enactment of mandatory penalties has either no demonstrable . . . effects or short-term effects that rapidly waste away." Barbara S. Vincent & Paul J. Hofer, Federal Judiciary Ctr., The Consequences of Mandatory Minimum Prison Terms: A Summary of Recent Findings 1 (1994) (quoting Professor Michael Tonry, Mandatory Penalties, in 16 Crime & Justice: A Review of Research, 243, 244 (1990)); see also Incarceration and Crime: A Complex Relationship, The Sentencing Project (2005); Don Stemen, Reconsidering Incarceration: New Directions for Reducing Crime, The Vera Institute for Justice (2007).

This over-incarceration is astronomically expensive. Taxpayers spend almost $70 billion a year on corrections and

incarceration.[3] The Pew Ctr. on the States, One in 31: The Long Reach of American Corrections 2009 11 (2009); see also 74 Fed. Reg. 33,279 (July 10, 2009) (reporting that in 2008, the average annual cost of incarceration for federal inmates was $25,895). In contrast, drug treatment is more cost effective in controlling drug-related crime than the continued expansion of the prison system. For example, a RAND Corporation analysis concluded that spending the same funds on drug treatment would reduce drug-related crime 15 times as much as mandatory minimum sentencing. Jonathan Caulkins, C. Peter Rydell, Williams Schwabe, & James Chiesa, Mandatory Minimum Drug Sentences: Throwing Away the Key or the Taxpayers' Money? (RAND 1997). While drug treatment has been demonstrated to be more effective than incarceration without treatment, there has been a sharp decline in persons actually receiving drug treatment while incarcerated. See Christopher Mumola & Jennifer Karberg, Drug Use and Dependence, State and Federal Prisoners, 2004, Bureau of Justice Statistics (October 2006).

---

[3] These costs are particularly significant to the federal system because of the increase in drug prosecutions brought in federal courts, presumably because of the potential for harsh mandatory minimums. Bureau of Justice Statistics, Federal Criminal Case Processing, 2002 (January 2005); see also Heather West, William Sabol & Sarah Greenman, Prisoners in 2009, Bureau of Justice Statistics (2010) (In 1980, prisoners serving time for drug offenses constituted about one-quarter of the federal population while in 2009, the percentage had doubled.).

27

As has been well documented, these harsh policies are devastating to communities of color.[4] Despite the fact that whites engage in drug offenses at a higher rate than blacks, blacks are incarcerated for drug offenses at a rate that is 10 times greater than their white counterparts. Jamie Fellner, Race, Drugs and Law Enforcement in the United States, 20 Stan. L. & Pol'y Rev. 257, 266-69 (2009) (citing U.S. Dep't of Health & Human Services, Substance Abuse & Mental Health Services Admin., Results from the 2006 National Survey on Drug Use and Health: National Findings, at tbls. 1.34A, B (2006)). "On any given day, nearly one-third of black men in their twenties are under the supervision of the criminal justice system-either behind bars, on probation, or on parole." Dorothy E. Roberts, The Social and Moral Cost of Mass Incarceration in African American Communities, 56 Stan. L.Rev. 1271, 1272 (2004); see also Carol A. Brook, Racial Disparity Under the Federal Sentencing Guidelines, 35 Litig., Fall 2008, at 1, 15. "African-

---

[4] Similarly, these policies have a disproportionate impact on female offenders, see Paige Harrison & Allen Beck, Prisoners in 2005, Bureau of Justice Statistics November 2006, and juveniles, see Patricia Soung, Social and Biological Constructions of Youth: Implications for Juvenile Justice and Racial Equity, 6 NW J. L. & Soc. Pol'y 428 (2011) (noting that the War on Drugs is sweeping youth in unprecedented numbers into the criminal justice system); Ellen M. Weber, Bridging the Barriers: Public Health Strategies for Expanding Drug Treatment in Communities, 57 Rutgers L. Rev. 631, 644-48 (2005).

Americans alone make up almost 40 percent of the federal prison population, although they constitute only 13 percent of our country's population.").

This ballooning of the percentage of blacks incarcerated over the past 25 years directly corresponds with the disparate treatment of crack and powder cocaine. Marc Mauer, Racial Impact Statements as a Means of Reducing Unwarranted Sentencing Disparities, 5 Ohio St. J. Crim. L. 19, 22-29 (2007) (attributing disparities in rates of black imprisonment in part to federal crack cocaine penalties). Originally the United States Sentencing Commission adopted a 100:1 statutory ratio in creating the guidelines. See United States Sentencing Commission, Special Report to the Congress: Cocaine and Federal Sentencing Policy at v (Feb. 1995). For example, the Act imposed a five-year minimum sentence for persons convicted of trafficking 5 grams of cocaine base or 500 grams of cocaine powder and a ten-year minimum sentence for trafficking 50 grams of cocaine base or 5,000 grams of cocaine powder.[5] However, as observed by the Supreme Court, unlike the sentencing guidelines as a whole, the Commission "did not use [an] empirical approach

_____

[5] In the Fair Sentencing Act of 2010, Congress lowered the 100-to-1 sentencing disparity between crack cocaine and powder cocaine to a ratio of 18 to 1. Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010).

29

in developing the Guidelines sentences for drug-trafficking offenses." Kimbrough v. United States, 552 U.S. 85, 96 (2007). As Judge Myron Bright stated, "[t]his lack of an empirical approach to the creation of guidelines for crack cocaine counsels against according controlling, or even significant, weight to the guidelines." United States v. Brewer, 624 F.3d 900, 912 (8th Cir. 2010) (Judge Bright, concurring in part and dissenting in part) (citing United States v. Dorvee, 616 F.3d 174, 187-88 (2d Cir. 2010) (holding that deference to the Guidelines depends on the thoroughness of the Commission's analysis and the validity of its reasoning)). See also Global Commission on Drug Policy, War on Drugs at 5 (June 2011) ("There is no excuse . . . for ignoring the evidence and experience accumulated since [the inception of the war on drugs]. Drug policies and strategies at all levels too often continue to be driven by ideological perspectives, or political convenience, and pay too little attention to the complexities of the drug market, drug use and drug addiction.").

To be sure, one of the fundamental flaws with mandatory minimum sentences is that the practice impedes district court judges from considering mitigating factors in sentencing in order to impose fair and just sentences. While it was thought that mandatory minimum sentences would reduce sentencing disparities, the opposite has come to fruition. Inconsistent

application of mandatory minimums has only exacerbated disparities because they transfer sentencing power from district court judges to prosecutors, "who may pre-set punishment through creative investigative and charging practices, producing troubling punishment differentials among offenders with similar culpability." Erik Luna & Paul Cassell, Mandatory Minimalism, 32 Cardozo L. Rev. 1, 13 (2010).

Here, as in many other cases, the district court expressly noted its discontent with the statutory mandatory minimum sentence. This disapproval among distinguished jurists is not unusual. See, e.g., Anthony M. Kennedy, Speech at the American Bar Association Annual Meeting (Aug. 9, 2003) (available at http://www.supremecourt.gov/publicinfo/speeches/viewspeeches.asp x?Filename=sp_ 08-09-03.html) ("By contrast to the guidelines, I can accept neither the necessity nor the wisdom of federal mandatory minimum sentences. In too many cases, mandatory minimum sentences are unwise and unjust."); Debate, Mandatory Minimums in Drug Sentencing: A Valuable Weapon in the War on Drugs or a Handcuff on Judicial Discretion?, 36 Am. Crim. L. Rev. 1279, 1284-85 (1999) (debate between Rep. Asa Hutchinson and U.S. District Court Judge Stanley Sporkin). See also John S. Martin, Jr., Why Mandatory Minimums Make No Sense, 18 Notre Dame J.L. Ethics & Pub. Pol'y 311 (2004); Jack B. Weinstein, Every Day is a Good Day for a Judge to Lay Down his Professional Life

31

for Justice, 32 Fordham Urb. L. J. 131 (2004); Gerard E. Lynch, Sentencing Eddie, 91 J. Crim. L. & Criminology 547 (2001). Even the U.S. drug czar, a position created by the Anti-Drug Abuse Act of 1988, admits the war on drugs is failing, stating that after 40 years and $1 trillion, "it has not been successful . . . the concern about drugs and drug problems is, if anything, magnified, intensified." Martha Mendoza, After 40 Years and $1 Trillion, Drug Use Is Rampant and Violence Pervasive, Associated Press, May 13, 2010.

C.

I share the district judge's dismay over the legally-mandated sentence he must impose in this case.[6] While the

---

[6] The district judge, a veteran of twenty-five years' service on the federal trial bench (and before that a highly-respected federal prosecutor) addressed the Appellant as follows at the original sentencing hearing in response to Gregg's protestation that a sentence of life without parole was unjust:

> Well, for the record, Mr. Gregg, I will tell you that I agree with you wholeheartedly. I think a life sentence for what you have done in this case is ridiculous. It is a travesty. I don't have any discretion about it. The government, obviously you irritated them in some way and they reached back to these 1996 possession and possession with intent[,] to do this, which under the law they have the right to do. I don't agree with it, either. And I want the world and the record to be clear on that. This is just silly. But as I say, I don't have any choice.

J.A. 311.

(Continued)

32

controlling legal principles require us to order the reimposition of a sentence of life without parole in this case, the time has long passed when policymakers should come to

---

As discussed in text at pp. 30-31, the district court's sentiments are shared by a wide swath of trial and appellate federal judges. To take just one reported example, Sixth Circuit Judge Gilbert Merritt, sitting by designation in the First Circuit, expressed similar, long-standing frustrations in a case in which the government filed a § 851 information to require the district court to impose a twenty-year minimum sentence. Judge Merritt spoke for many federal judges when he wrote:

> I agree with the District Court that the prosecution's decision to seek a mandatory sentence of 20 years under 21 U.S.C. § 851 passes all understanding. The District Court said: "I recognize you [AUSA] do this at the behest of your superiors. But I can't sit here today and impose this sentence without saying it's wrong, and you can take that message to whoever you think might listen." The Judicial Conference of the United States for almost 20 years, and the Sentencing Commission for almost 10 years, have pleaded with the judiciary committees of Congress to do something about the serious injustices that these long, mandatory minimum sentences impose-to no avail. This is a 20-year sentence for a nonviolent crime by a defendant with a serious mental illness. His incarceration will cost the American taxpayers in today's dollars somewhere between $600,000 and $1,000,000. With some carefully monitored rehabilitation treatment, it is possible that he could be released in just a few years. Like the District Judge, I think that the prosecution's purely discretionary decision to ratchet up this sentence to 20 years is misguided and ought to be reconsidered when the judgment becomes final.

United States v. Gonzalez-Ramirez, 561 F.3d 22, 31 (1st Cir.), cert. denied, 130 S.Ct. 524 (2009) (Merritt, J., concurring) (bracket in original).

33

acknowledge the nation's failed drug policy and to act on that acknowledgement.

As a nation, we are smart enough to do better.